Good morning. May it please the Court, my name is Kathleen Miller. I'm an attorney for the Port Authority of New York and New Jersey and Gary Fratelli, the defendants in this case. The verdict in this hostile work environment case should be set aside because it's based upon multiple errors of law. First, the jury was improperly given a verdict sheet which allowed joint liability against both the Port Authority of New York and New Jersey and the individual defendant, Gary Fratelli. There is no evidence in this case of policy, custom, or practice. Does that matter under Section 1981? It does, Your Honor. This Court has held that the Port Authority In 1981 case, yes. In 1981, this Court has held in Raynor that the Port Authority was entitled to Monell, that it could not be held liable on the grounds of respondeat superior, that in order to establish liability under 1981 against a government agency, the Port Authority in particular, the plaintiff had to establish a custom and practice. A motion was made for summary judgment before the trial judge. That motion was denied, and in footnote 3 of the decision, the judge stated that the Port Authority was not entitled to Monell because it was not a municipal agency. That ruling Doesn't require overturning the verdict. We could remand it and the Port Authority's liability could be capped at $300,000 under Title VII, right? You don't have to do the trial over again. That is one point, Your Honor. There's a second point. There's a consequence. There are two consequences in our view as to allowing this to go against the Port Authority under 1981. It could only go against the Port Authority under Title VII. Under Title VII, the Port Authority was entitled to a limitations period of 180 days prior to the filing of the EEOC charge, which was filed on July 11, 2014. That date was January 12, 2014. What happened in this case was discrete acts of conduct were allowed to go to the jury as part of this so-called continuing violation hostile work environment claim. And my second point, Your Honor. Some of them were clearly comments and things like that, which would be consistent with, I know there are some discrete acts that you're referring to, but some of the things that occurred before the limitations period were things like comments that certainly could be part of a continuing violation, right? Correct, Your Honor. I agree with what the Court says. Did you ask the judge to, the trial court, to give an instruction to the jury that the discrete acts prior to the limitations period should only be considered as background? Was there a request for such an instruction? I didn't request such an instruction, Your Honor, because I'd already lost the motion for summary judgment. And in the summary judgment motion, I argued that the discrete acts could not be considered. And the court ruled And the trial court said that they could be background, right? Isn't that what the trial court said? But the court ruled against me, Your Honor. So that was law of the case as far as I was concerned. The trial court in its I understand. The law of the case was that it could be considered as background. That was the law of the case. So all you had to do was ask for an instruction to the jury that the discrete acts prior to the limitations period should only be considered as background. It wasn't inconsistent with Well, the judge never gave that instruction. Did you ask for it? I didn't ask for it, Your Honor, because in my view, the law of the case was the judge had said that prior discrete acts could go in as part of the hostile work environment claim. And he didn't specify that they were going in as just background. He indicated that it was part of the hostile work environment claim. And I would like to look at that hostile work environment claim, because in our view, summary judgment was improperly denied, and it should have been granted because there was insufficient evidence here to go to a jury. Well, that's fine. Just let's make sure that we have exhausted this question as to whether this was preserved by your requests at trial in light of the fact that you were the ‑‑ whether the ‑‑ you're losing summary ‑‑ the motion for summary judgment, how that affected the fact that you apparently did not move to have this limitation given to the jury at trial? Well, I indicated at the close of the plaintiff's case that I was making a motion to dismiss based on ‑‑ and the court knew what my grounds were because I had already clearly articulated them in a summary judgment motion. And in the world of the trial law, the judge had indicated that we were going to finish this trial by Friday. The plaintiff didn't complete her case until around 4 o'clock on Thursday afternoon. So I had one hour on Thursday afternoon and probably up until around 3 o'clock on Friday to present the entire defense case. So we reserved on the motion. But the plaintiff clearly knew what the grounds for the motion were because they had already been set forth at length in written papers on the motion for summary judgment. And those grounds were that there were three alleged statements of discrimination made by Gary Fratali, the plaintiff's supervisor. One of these was somewhat dubious. It mentioned you people and involved a complaint that ‑‑ How many of them were within the limitations period? One. One. But I'm not arguing the other two comments that the plaintiff attributed to Mr. Fratali were discriminatory. One of them involved saying you effing Indian and the other involved you know you're not white. I'm not arguing that the statements ‑‑ I thought that the question that has been raised, I didn't raise it, but I thought ‑‑ I'm sorry, Your Honor. My fault. I thought the question that has been raised is whether damages from all three of those from the entire period could be assessed against you or could have been assessed against you or not. And if the answer is no, they couldn't, the question is did you have an opportunity and did you say to the judge, for heaven's sake, tell them, tell the jury in whatever words that two of those can be used as background, but you cannot assess damages based on them. I think that's ‑‑ isn't that what we're supposed to be talking about? I didn't make that specific request, Your Honor, but I certainly objected at trial to questions where the witness was testifying that certain conduct, namely his suspension in October, was retaliatory. I certainly made objections in the course of the trial, although they're in the nature of evidentiary, to testimony involving his application for the junior supervisory assessment program, which was a discrete act that was prior to the limitations period. I certainly objected to some of his testimony concerning the denial of the boiler training, and I certainly objected to some of his testimony concerning the Thanksgiving meal reimbursement. Those are the three acts that were outside the scope of the 180 days, and they were three acts which he testified to at length. I mean, this was not just put in as I was denied the boiler training program. He testified for pages. There was nothing improper about those being considered by the jury as background. The law is clear that even discrete acts can be considered as background. And you said the district court didn't refer to it as background in his summary judgment decision, but on page 6, there is a specific line where he does so in his opinion. So I'm not sure where you're saying that the judge didn't do that. In the summary judgment, he specifically said that they could be considered as background. How would the jury know this is background? The plaintiff testified. You have to ask the judge. That's the whole point. You have to ask the judge. Judge, we want the jury to get an instruction that these discrete acts should only be considered as background. The judge is not necessarily going to do that on his own. Well, we believe, Your Honor, that they didn't go in as background. There was no way for the jury to know. But if the point is if you had asked the judge even prior to their going in or said, counsel, are you going to elicit testimony about this? Judge, may we have a limiting instruction? Ladies and gentlemen of the jury, you are about to hear testimony about things that happened X, Y, and Z. You may consider this as background information. You may not consider them with respect to plaintiff's claim for damages. And you probably could have asked or could have asked and should have been given perhaps.  Your Honor, judge, when you instruct the jury, would you please remind them that these acts, which we said shouldn't have been considered, can only be considered as background information and may not be considered when they are determining damages if they indeed reach an award, reach consideration of an award for damages? You're correct, Your Honor. I didn't go that third step. I made the motion. I made the objections during trial. Isn't that a problem? I didn't go the third step. Well, let me go, as we're getting into instructions, I'd like this Court to look at the jury instructions in this case. This judge instructed the jury that a hostile work environment was satisfied if it affected the terms of the individual's employment. The standard is not affected. It's altered. Now, plaintiff's counsel will say, well, later on in his discussion, he used the word altered. All that did was confuse the jury. Ms. Miller, it wasn't later on. It was the very next sentence. He said when I used, he explained what altered means and he, I mean, what affected means, and he said altered in the very next sentence. I looked at it last night. It was the very next sentence. But affected and altered are two completely different things. Affected, anything affects you. Altered is to change, to transform the conditions of your employment. All that did was confuse the jury that altered and affected were interchangeable words. And we requested, here we did specifically tell the court that the standard was altered, we submitted a charge on altered, we objected to the charge to the term affected, and the judge went ahead and used the term affected. So we believe that he substantially misled the jury as to what a hostile work environment was. In addition, he didn't ---- Your red light's on at this point. When you stand up for rebuttal, you might comment on the ---- Maybe if it's all right with the presider, we can do a little on just on the amount of the award. No, that's what I was going to suggest. But, yes, we can do that now. That would be fine. Can I just say one thing about the punitive damage? I want to say the award, if you disagree with me about all this, the award is clearly excessive. It's a two ---- If you want to hear about it. Please address it. And the award ---- How do we assess? How do I decide whether my judicial conscience is shocked or not? Which I gather is the test. I mean, how do we ---- It's a big award. How do we compare it with other awards? How do we go about assessing whether it's excessive? Well, the compensatory damage award, it's a garden variety emotional distress claim. There's no loss of job here. He had another job effective in April of 2014, months before he left the Port Authority. He had an offer to work as an oilman for $92,000 a year, much more than he would have gotten as a watch engineer. But the standard there is for a garden variety claim, it's a hundred ---- Garden variety, if the hostile environment, just assume the hostile environment, is dreadful, it's just the worst imaginable, but he's got another job and he goes elsewhere, does that ---- is it still garden variety despite the level of the hostility in the word? Well, the courts have said, this Court has said, that it has to be some out-of-the-ordinary act that creates the hostility, number one. Here we only have the three comments. Number two, it ---- he needs medical testimony. Here he really didn't have medical testimony. He had Mr. Schneider, who is incorrectly described as a psychiatrist. He's a clinical social worker. You saw him 14 times. He went to his internist three times. The first time was for a physical, and all he was complaining about was stress and insomnia the second time he went. There is no evidence in this record that he suffered from ED as a result of this. Okay. That's what I kind of wanted to know. I was just thrown off by the question of whether he had a job waiting or not, and how that relates to his physical and psychological injuries. Well, Your Honor, we submit that even if this Court thought that the clinical social worker's testimony that he was depressed, but he got better after three months, and the fact that he was given mild doses of Elevil by his internist for insomnia, even if you thought that nosed it over into significant, it's got to be at the bottom of the list. And the top awards sustained where there's just emotional pain and suffering, no other consequences, been around 200,000. So this case, I submit, would be the value. The Lackawanna case up in Buffalo, which was a one-point-some-odd million, I remember it because I was sitting here. Wasn't there hospitalization in that case? I will not submit to cross-examination. The cases that I looked at, either there was some form of public humiliation. In this case, we have no corroboration that Gary made any of these statements. Four people came in who were also black and from the Caribbean who worked under Gary, never heard him make a racist comment in all the years they worked for him. One of them came back who was retired, who was from India, who said never heard Gary make a racist comment in all the years he'd worked there. But I would ask this Court for just a moment. The punitive damage award here is really based on a denial of due process. The witness was not able to put before the jury any of the facts and circumstances of his financial condition. We tried, but the judge said on the record he was not going to let me engage in that line of questioning. Scalia. I'm taken by that argument because back when Mercedes Benz came down from the Supreme Court and sort of talked about the due process issue, I was doing a fair amount of both defense and plaintiff's work and, man, did we beat that horse to death. So what case do you have for the proposition that in the circumstances presented here, an individual who is potentially subject to punitive damages has the right, has a right derived somewhere to put in his own financial condition? Well, I can't recall exactly, but I had them in my brief, Your Honor, that the individual who's being sued for punitive damages, it's in the nature of a criminal complaint and the person, because they are liable for those damages, which Gary testified he was, he said, if I am found liable for punitive damages, I could lose my house. And then when I attempted to go into what his financial circumstances were, the Court told me I would not be allowed to do that. So he cut off the line of ---- You didn't explain to the Court. You said, I want to go into, he mentioned I could lose my house, and you said, well, I want to go into your liability, and then the judge cut you off. But you didn't say, Judge, we need to bring this in on punitive damages to go into his financial circumstances. The judge would have had to be a mind reader to know that at that point that's where you were going with that line of questioning. You didn't even tell the judge what the purpose of the questioning was. Well, the judge didn't really give me an opportunity to do that. He told me to move on. And I, when I'm in a trial court in front of a jury, I tend not to argue with the trial judge. It's a difficult position to be in. How would he know you're moving to punitive damages? A lot of times that's bifurcated. A lot of times the financial issue is bifurcated at a later time. So I don't know how he would have known that at that point you were suddenly going into the financial circumstances for punitive damages. Because we had the charging conference before Gary Fratelli was on the stand, and the judge indicated that he was charging punitive damages at that time when he sent the case to the jury. And he had a line for punitive damages on the verdict sheet. So he knew that. You didn't explain the purpose of the questioning is what I'm saying. I'm sorry? You didn't explain the purpose of that questioning to the judge. Whatever the charge conference was, obviously there was a punitive damage issue. But you didn't explain to the judge that that was the purpose of that questioning. It's an unusual line of questioning, in other words. So it wouldn't be unusual for a judge to sustain you going into what your client's liability was going to be without knowing that this was the particular purpose is what I'm saying. In other cases, I can only say, Your Honor, in other cases where there's been a punitive damage claim, and I have certainly been able to ask the person who's being charged with a punitive damage claim about their financial circumstances without explaining it to the court. But to alert the judge, one tool is an offer of proof. I mean, Your Honor, for the record, I need to make an offer of proof, and then you go forward. Well, the punitive damage issue had also come up in the motion for summary judgment. Well, I'm not saying the punitive damage hadn't come up, but district judges, although sometimes they have this view of themselves, really are not mind readers all the time anyway. And it's helpful to the court, and therefore helpful to us when we review the record, for some further indication to have been made to the court as to why you needed to ask that question or when you asked that question, you were going to elicit the following information. And at least then we would see in the record that the court had an opportunity to rule on that and perhaps got it wrong and that sort of thing. Well, in addition to my argument on the due process, I think the punitive damage, we submit the punitive damage board is clearly excessive for two allegedly uncorroborated and undocumented until plaintiff had an attorney discriminatory statements. Well, you've reserved some time. Can I ask one technical question? I'm sorry. At the very beginning of the argument, you mentioned a case, I think it was respect to section 1981 and municipality. And would you remind me what case it was? Raysor? R-A-Y-S-O-R. That's all I need to know. Thank you. Thank you. Thank you. We reserve two minutes for rebuttal. Good morning, Your Honors. May it please the Court. My name is Marjorie Mesidor, and I represent the Plaintiff Appellee. The jury had evidentiary basis to find that defendants subjected plaintiffs to a hostile work environment based on race and national origin. And the trial record also supports the damage award as rendered, Your Honor. There are three buckets in which this Court could respond to each one of the questions presented by Defendant Appellee. In each circumstance, the Court should affirm. The Court can affirm on the basis of the fact that the findings of fact, the damage and awards, et cetera, are square within the purview of the jury, that they are the ones who are best for the credibility and weight of the evidence as well as the damages. The second way that they can respond is that defendants fail to preserve the evidence. I'm sorry. To some extent, that's true, but it is up to us. It's not up to the jury alone or even up to the jury and the trial judge alone to decide whether the award of $2-plus million in this case is too high as a matter of law. I hate the phrase shocks the judicial conscience because it depends on a whole lot of things. But there's a serious question about the amount of the compensatory award. And you can't just stop at the point that's what the jury said. That's what I'm saying. I'm just picking up on your words, well, that's what the jury decided. Now we have to decide it. And how do we go about that? You can do that later in your argument if you want. But that's the question for us. Well, Your Honor, you're absolutely correct. And in my statement, I was not certainly taking away the sound reviewable fact that excessiveness and if it shocks the conscience is clearly within this Court's ability to decide it, Your Honor. But what we are indicating is that the jury had sufficient evidence to find the $2.3 million award that they had here, Your Honors. And the Court has specifically said that it will not substitute its own judgment for the jury just because they would have otherwise given a lower amount. And the record, yes? I think the fundamental problem is this is an abuse of discretion issue for the trial court reviewing the jury award, correct? Yes, Your Honor. The trial court did an electronic notification sustaining the outcome of the trial, including the damages, right, with no reasoning. So how can we've said over and over again in many other contexts that we can't review a decision for abuse of discretion if no reasons were given. And for the fee award, the same thing happened. It was an electronic notification granting your fee application in its entirety for $177,000 or something like that. That is correct, Your Honor. Before their time to respond had even expired. It was 13 days later. So, again, how can we sustain? The trial court saw the trial and should give reasons for why what is a very high award. I think you recognize $2 million is an extremely high award, right? Yes, Your Honor. We have no reasoning for why that award should be sustained in this case. So why, at a minimum, shouldn't the case be remanded for the trial court to provide the reasons for that? Your Honor, I'm going to answer your question in two parts. First, as it relates to the damages issue, Your Honor, the matter was fully briefed and considered by the court. Its outright denial of defendant's motion is an adaptation of plaintiff's arguments that the record is sufficient, which included, Your Honor, the erectile dysfunction that did not exist prior to working at the Port Authority, the binge drinking that took place over a series of nights to the point of passing out, the sexual promiscuity, extramarital affairs, the paying for sex, Your Honor. We're talking about an individual who went from a God-fearing family man to being completely destroyed in his lifestyle and fabric of a person to being a shell of a person to a licensed clinical social worker. Yes, Your Honor. One of the factors, though, is comparing it to other verdicts. Judge Sackman mentioned one, but I saw that there was one. Give me any case, state or federal, with garden variety and emotional damages that has where a verdict has been sustained for $2 million or more. How many in the history of New York State or federal courts in New York in this circuit has that happened? Your Honor, there are no cases that say that this is garden variety and a million-dollar award. There simply are none. But we maintain that this is not, that this is egregious and not garden variety. And there are a number of cases, Your Honor, including Thorson, Ravina, Phillips, Duarte, Hughes, Brady v. Walmart, and Turley that sustain that when it is egregious emotional distress damages, as evidenced here, Your Honor, where there's a completely change in lifestyle, debilitating factors, Your Honor, that an award of this amount at the very least, Your Honors, would be a seven-figure sum. We don't look at all in our determination of this and our consideration of this what it was proven as discrimination or hostility that gave rise to it. We do look at that, Your Honor, but that's a part of the inquiry, not the totality of the inquiry. Then the end of the question is, so let's just say there had been one act of hostility. This is a hypothetical, so you can skip, these aren't the facts of this case, because I understand that. Let's say there's one act of hostility, and then all of these other effects, which I guess the jury was allowed to find or at least consider, were the result of that one act of hostility. We can't say, well, man, that's way out of proportion to the act of hostility. What occurred to you or to the plaintiff is way out of proportion to the one act of hostility. That's not a consideration for us? That is absolutely a consideration for this Court, Your Honor, and the Court is free to do that. But in that circumstance, Your Honor, it would clearly have to take into context looking at the totality of the circumstances as to what that act of hostility actually is, Your Honor. That's why that they're looked at in tandem, what happened and how it affected. There are cases where you have nooses in the N-word, and it's the egregiousness of those acts that make it seven-figure okay. And then there are cases where you say seven figures covers a lot of ground. So what you're saying is a million dollars, we have the basis for that, and the facts you're referring to, the N-word, the nooses, and so on and so forth, that was indeed an award of 1.3 million, I think that was affirmed by this Court. Yes, Your Honor. Now, how do you get from 1.3 to 2.2 or 8.7? Seven figures doesn't help me a whole, it helps me a little, but it doesn't get me as high as you want it to get me. It's an awful lot of money for almost any injury I can think of, and you wonder where it came from. Your Honor, it's not lost on me that it's an awful lot of money. This was indeed a life-changing effect on my client here. And the case that you're referring to, Turley, Your Honor, I understand that we were dealing in nooses in that case and the N-word. But that can't be the only bar of discrimination, Your Honors. It's important. I doubt that. I'm trying to figure out how I'm supposed to compare. Let's assume that the facts were identical. I'm not trying to figure out which is worse for now. I'm just trying to figure out how you go, how you wander around among seven figures and just say, well, it's seven figures. How do I get from what was 1.3 in Turley? Let's assume it's exactly the same. I'm not sure it was because it was a three-year period, but never mind. Let's just say, how do I get from 1.3 million in that case to the amount in this case other than the fact that that's well, that's what the jury said? In two ways, Your Honor. First and foremost, as distinguishable between the facts here and in Turley, Mr. Fratelli put forth Mr. Surjbali's name toward the investigators as it relates to the boiler being sabotaged, which bared criminal liability and would have been career-ending. His position is a high-security position at an airport. To be accused of sabotage, Your Honor, it borderlines on terrorism in certain respects. And would have destroyed him both from an economic perspective and from a penal perspective, which I think goes above and beyond what happened here in Turley. In addition, the jury was also free. Yes, Your Honor? A short period of time, though. He was suspended, right? How long was he suspended for as a result of that investigation? He was suspended, Your Honor, for a few weeks, Your Honor. Pay, right? Yes, he was suspended with pay. And then he got cleared, right? Right, because there was no evidence to support. You think that puts this in the category of so egregious that it justifies over $2 million? I mean, this is a case, even though there's a difference between can the jury find a hostile work environment, can it justify $2 million? It may justify a hostile work environment, but it was three comments, this incident that you recounted, and five counseling memos, right? Isn't that essentially what we have? Three comments, five counseling memos, and this sabotage allegation, right? Your Honor, we have a lot more than that. During the applicable time period, or are you talking about earlier? No, during the applicable time period as it relates to the hostile work environment. Besides the three comments, the five counseling memos, and the sabotage incident. In addition to that, Your Honor, my client testified at length that Mr. Suruj Bali would come off on days of work and follow him around the airport, intimidating him physically with his presence and putting pressure on him to do the work. That at every moment that Mr. Fratelli used his physical presence to intimidate him, to harass him, that the comments were not just three comments, Your Honor, both within and without of the area of purview here. They include fucking Indian asshole, you're stupid, this is why you people are the way you are, you're not an American, you're a wannabe, what do you think, you're white, you type of people, all of these specifically targeting his intelligence and his capability to just really elevate and be promoted. Your Honor, my client is an immigrant coming to this country and did everything right. He went to school, he did well on his job, he supported his family, he did everything that we as a nation ask that immigrants come here and do. And Mr. Fratelli never gave him a solid chance. Not even once. He always thought that because he was, and I quote, a fucking Indian asshole, he did not have the wherewithal, the intelligence or the purview to be able to do basic things like pass tests and to be elevated. Each one of the individuals that they brought before the court indicating that they never heard him make the comments, not one of them had tried to get a promotion or elevate in any way. Not one of them. And that was what Fratelli did. He interjected himself at every point to block my client from being promoted. He interjected him on the JSA, didn't give the document. He interjected him after he passed the boiler exam and was qualified to be on the test. He found out what he had on one portion of the test and tried to use that to block him. He tried to block him every stand in the way. And when it didn't work, he accused him of boiler sabotage, Your Honor. Let me just ask you before your time is up about the Port Authority itself. Isn't it a fact they're a municipality and therefore $300,000 is the most that can be awarded against them under Title VII? Your Honor, we agree that they are a municipality. We disagree that the $300,000 would be the cap because, in our view, they waived the Section 1981 arguments by not asking a specific Monell charge. They did not preserve it when they did the JMOL motion. Why isn't that sufficient to preserve it? If the judge should have given them summary judgment on that, isn't that sufficient? Your Honor, case law indicates that a preservation on that issue, only on the summary judgment level, is insufficient to preserve it on appeal, particularly when they go to the — when they start making arguments as to whether or not there's sufficiency of evidence. When they start making arguments of sufficiency of evidence and don't request the appropriate charge, do not put the parties — put me on notice that I have failed to meet my standard in a way that I could cure the record at the JMOL perspective, Your Honor. It's trial by sabotage. At the very least, the notice is supposed to be both fair to us and to the court. If you had no policy evidence at the time of summary judgment, how would you have policy evidence at the time of trial? Your Honor, we do have — we have evidence of — there's a clear record on custom, which, if Your Honor would like, I could point out all the issues, all the evidence that we have on this record that there is custom under Section 1981. We show that there is custom because Mr. Surujbali complained to Mr. Fratelli's boss regarding the racial slurs. They did nothing. He complained to HR. They did nothing. He complained to EEO. They did nothing. The director of EEO sat in front of a courtroom in front of 12 jurors and said that they didn't make even basic fact inquiries as to whether or not the discrimination was based on race. My client — he said that he understood that my client said he was being singled out. They didn't ask about the race of the other individuals as to how they were charging. He clearly admitted that some of the actions that my client described — I'm going to use a loaded word — that it's policy, kind of Manel, policy or custom, and you're saying there was plenty of policy or custom. Is that right? We are saying, yes, that there's plenty of custom. Are you saying that — are you, therefore, saying it was necessary for it to be policy or custom because of the municipality? I'm going back to whether it was the municipality and whether that limitation applies or not to this case either under 1981 or even under Title VII. We say two things, Your Honor. Custom was not necessary. If the court disagrees with us — Help me out. It was not necessary because it was not a municipality? Why was it not necessary? We maintain that custom was not necessary, Your Honor, because — on two fronts. One, the Section 1981 issue is not a purely legal issue. Two, although we believe that it can go either way, that they are a municipality, we maintain that they are not. If the court disagrees with us, we have sufficient evidence of custom. And albeit all of that, if the court says they are a municipality and the custom is not sufficient, there's still a Section 1981 award against Mr. Fratalli, an individual for which the remainder of the verdict could be sustained. So even if the court found that, they could cap it on Port Authority at $300,000, and the remaining $2 million or $1.8 — sorry, math is not my strong suit — could be let over to Mr. Fratalli. And it does not show the fact that at the root of this, that defendants did not appropriately preserve the record on this issue. You're saying — you're not saying it could go either way, but either way you win. Yes, Your Honor. And as it relates to the custom record, it also shows that there was no EEO investigation, even though the documents themselves Mr. Surjbali specifically placed that he put in the discrimination. And when I asked Mr. Turner, why did you not even ask him whether it was based on race, the race of the other people involved? He said there was fabricated evidence. Why didn't you look at that? He had a clean record before he came to you. Why didn't you look at that? And all that he says is — he basically indicated that he didn't find it remarkable, and this is the way that they always do it, Your Honor. And at the very least, if they had raised this Monell issue, we could have highlighted this in our summation. We could have highlighted these at every point. But what they are essentially doing is that they fail to preserve, and they're asking this Court to do the work for them. And that is not — it's not appropriate. It's prejudicial both to plaintiff and to the district court judge, because then at the very least the record could have been cured, as opposed to now coming before the appellate court, which, by the way, the Section 1981 comment — argument only came in their reply brief on their 50B motion. It was not part of their original new trial motion. It was almost an afterthought as it relates to all of that, Your Honor. Thank you, Ms. Mesidor. Thank you, Your Honor. Ms. Miller, you've reserved two minutes for reporting. Thank you, Your Honor. The Court asked me, when I was up here originally, about cases having to do with punitive damages and the ability of a witness to — to testify about their financial condition. And the cases I cited in my brief were the Supreme Court State Farm Mutual Auto Insurance v. Campbell. What page of the brief are you looking at, Ms. Miller? That was where the — Ms. Miller, what page of the brief are you looking at? Page 53 of the main brief, Your Honor. Thank you. And then that's where the Supreme Court talked about punitive damages being in the nature of a criminal penalty. And then I also cited Zarkone v. Perry, which is a court — a decision from this court that said that under these circumstances where the defendant is being at risk of punitive damages, he has the burden to demonstrate his or her financial means to pay that. I'd like to respond to a few comments that were made by counsel. One is she referred to excessive emotional distress, binge drinking, and sexual — risky sexual conduct. None of that was ever testified to by Plaintiff in his deposition. He never told that to his — to the clinical counselor. No one was aware of that. The first time he testified to that was at trial. So was that — No one — Was the absence of that — was he, one, cross-examined on it, and two, if he was cross-examined on it, was that pointed out to the jury in summation? There's no testimony as to how long that went on. He simply testified that he did that. He never told his doctor he did that, the internist. Was the fact that the evidence said that to the court, was that something the court — Well, there was no substantiation for it in the medical record. So, again, you get into the — Yeah, I have a question. It's not one of the — it's not something you like to ask anymore. Because I don't ask anymore. Okay. If that's so, is it not what you do at trial? You say, that's about what you — what are you talking about? You don't get out of the garden variety claim where you have emotional pain and suffering unless you have some substantiation, some medical substantiation. There was no medical substantiation for any of that. So he's still within the framework of the garden variety claim. Counsel mentioned life-changing events. There was no life-changing event testified to. He never left his family. No friends came in and testified on his behalf that he behaved differently. Family didn't come in and testify on his behalf that there was something that happened to him in his personal life. No one came in from work to testify that he was subjected to any of this harassment. The only testimony was plaintiff's own testimony on these matters. And finally, let's look at what really occurred. Finally, I wanted to look at what occurred within the 180-day period. What occurred were five counseling memos, all involving incidents which plaintiff admit happened. His testimony was he wasn't responsible for those incidents. Or Mike Ward in the first counseling memo about insubordinate behavior mischaracterized his behavior, although he admitted to writing a very peremptory note to his boss saying that he was going to take back the time when he wanted to. But all of the other incidents were substantiated incidents, and he admitted to them. He tried to explain away his conduct. And in addition to that, counseling memos have been held by this Court in the Weeks case or something like counseling memo to just be criticism, and criticism is not in itself discrimination. Counsel mentioned the criminal accusations of sabotage. That's completely unsupported in the record. Section 5929 are the IG investigation reports. On October 17th, the IG began an investigation into sabotage of the boilers. Wires were cut. The boilers could have exploded. On October 17th, the IG report states they were told by John Muenzen that because plaintiff had filed a or circulated at the Port Authority a discrimination complaint, it had been decided he was going to be suspended that day. The IG didn't interview Gary Fratale, who's being accused of getting the plaintiff suspended, until October 22nd. And that's clearly stated in the record. And when they did interview Fratale, Fratale said he thought it was plaintiff, but he didn't think that plaintiff should be suspended because there was no evidence to support it. And that's stated in the record. And there was no testimony to the contrary except plaintiff's speculative testimony that Gary retaliated against him and had him suspended. I objected to it. He was still allowed to testify to it. So there's no connection between the suspension and sabotage and Gary Fratale. That was decided by other people. He was suspended with pay prior to the IG's ever interviewing Gary Fratale. Counsel also mentioned that there was plaintiff testified that Gary Fratale followed him around and micromanaged him. Well, if micromanagement is discrimination, half the supervisors in the city are going to be held, brought to this court on discrimination charges. Micromanagement may not be the best style, but it's certainly a lot of people's style of management. He never testified that any time during that so-called micromanagement was he subjected to any discriminatory remarks other than the three discriminatory remarks which had been brought to this court, which were litigated in the summary judgment motion, which he testified to more or less at trial. There was no additional discriminatory remarks ever testified to. Thank you, Ms. Miller. Thank you, Your Honor. Thank you. Thank you both. We'll reserve decision in this case.